## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA
United States Department of Justice
Antitrust Division
450 Fifth Street, N.W., Suite 8700
Washington, D.C. 20530,

      Plaintiff,

         v.

CRH PLC
Belgard Castle
Dublin, Ireland 22,

CRH AMERICAS MATERIALS, INC.
900 Ashwood Parkway
Suite 600
Atlanta, Georgia 30338,

      and

POUNDING MILL QUARRY CORPORATION
171 Saint Clair Crossing
Bluefield, Virginia  24605,

      Defendants.

## COMPLAINT

The United States of America ("United States"), acting under the direction of the

Attorney General of the United States, brings this civil antitrust action against defendants CRH

plc ("CRH"), CRH Americas Materials, Inc. ("CRH Americas"), and Pounding Mill Quarry

Corporation ("Pounding Mill") to enjoin CRH Americas' proposed acquisition of Pounding

Mill's assets.  If defendants are permitted to consummate this acquisition, it would substantially

lessen competition for the supply of aggregate and asphalt concrete in southern West Virginia.

The United States alleges as follows:

## I.   INTRODUCTION

1.     CRH Americas' acquisition of Pounding Mill's aggregate quarries would secure CRH Americas' control over the supply of materials necessary to build and maintain roads and bridges in southern West Virginia.  Aggregate and asphalt concrete are the primary materials used to build, pave, and repair roads.  Aggregate is an essential input in asphalt concrete, which is used to pave roads, and is also needed for other parts of road construction, such as the base layer of rock that provides a foundation for paved roads.  CRH Americas currently supplies both aggregate and asphalt concrete in southern West Virginia and already holds significant shares in each market.

2.     The proposed acquisition would result in CRH Americas owning nearly all of the aggregate quarries that supply southern West Virginia.  CRH Americas and Pounding Mill are the primary suppliers of aggregate for West Virginia Department of Transportation ("WVDOT") projects in that area, together supplying well over 80 percent of the aggregate purchased directly by WVDOT or purchased by contractors for use in WVDOT projects.  The proposed acquisition would eliminate the head-to-head competition between CRH Americas and Pounding Mill.  As a result, prices for aggregate used for road construction would likely increase significantly if the acquisition is consummated.

3.     CRH Americas' acquisition of Pounding Mill's quarries also would strengthen the virtual monopoly CRH Americas currently holds over the supply of asphalt concrete in southern West Virginia.  In that market, CRH Americas competes with only one small new entrant, which has a small market share, but is poised to grow.  That firm currently procures aggregate from Pounding Mill which, unlike CRH Americas, has no presence in the asphalt-concrete market. There are no alternative aggregate suppliers to which that asphalt-concrete competitor can

economically turn.  The merger would give CRH Americas the means and incentive to disadvantage or exclude its asphalt-concrete competitor by denying it access to aggregate, reliable delivery, and competitive prices.  Without access to a reliable source of aggregate, any future asphalt-concrete suppliers would be barred from entering the southern West Virginia market.

4.     The state of West Virginia spends hundreds of millions of dollars on new construction and road maintenance projects each year.  With approximately 36,000 miles of state-maintained roads, West Virginia boasts the sixth largest state-maintained road system in the United States.  Without competing suppliers for the necessary inputs for road construction and other infrastructure projects, the state of West Virginia and federal and state taxpayers would pay the price for CRH Americas' control over these important markets.  In light of these market conditions, CRH Americas' acquisition of Pounding Mill's quarries would cause significant anticompetitive effects in the markets for aggregate and asphalt concrete used for WVDOT road projects in southern West Virginia.  Therefore, the proposed acquisition violates Section 7 of the Clayton Act, 15 U.S.C. § 18, and should be enjoined.

## II.    DEFENDANTS AND THE PROPOSED TRANSACTION

5.     Defendant CRH, a corporation headquartered in Ireland, is a global supplier of building materials.  In the United States, CRH, through its vast network of subsidiaries, is a leader in the supply of aggregate, asphalt concrete, and ready mix concrete, among numerous other things, conducting business in 44 states, and employing 18,500 people at close to 1,200 operating locations across the country.  In 2015, CRH had global sales of approximately $26 billion, with sales in the United States of approximately $14 billion.

6.      Defendant CRH Americas is incorporated in Delaware.  CRH Americas' principal place of business is in Atlanta, Georgia, and the headquarters of its Mid-Atlantic Division is in Dunbar, West Virginia.  CRH Americas is a subsidiary (through its parent CRH Americas, Inc.) of CRH plc.  CRH Americas is one of the largest suppliers of aggregate, asphalt concrete, ready mix concrete, and construction and paving services in the United States.  CRH Americas has a large network of subsidiaries in the United States that operate in different localities.  For example, West Virginia Paving, Inc. is a subsidiary of CRH Americas.  West Virginia Paving, Inc. is a highway grading and paving contractor throughout West Virginia.

7.      Defendant Pounding Mill is a Delaware corporation headquartered in Bluefield, Virginia.  Pounding Mill owns and operates four quarries—three in Virginia and one in West Virginia—from which it supplies aggregate.  In 2015, Pounding Mill had sales of approximately $44 million.

8.      In June of 2014, CRH Americas and Pounding Mill signed a letter of intent pursuant to which CRH Americas agreed to purchase Pounding Mill.  The primary assets to be acquired are Pounding Mill's four quarries, including the real property associated with those quarries, and the equipment used to operate the quarries.  The parties entered into a purchase agreement in March 2018.

## III.      JURISDICTION AND VENUE

9.      The United States brings this action pursuant to Section 15 of the Clayton Act, 15 U.S.C. §25, to prevent and restrain defendants from violating Section 7 of the Clayton Act, 15 U.S.C. § 18.

10.      Defendants produce and sell aggregate, asphalt concrete, paving services, and other products in the flow of interstate commerce.  Defendants' activity in the sale of aggregate and other products substantially affects interstate commerce.  The Court has subject matter jurisdiction over this action pursuant to Section 15 of the Clayton Act, 15 U.S.C. § 25, and 28 U.S.C. §§ 1331, 1337(a), and 1345.

11.      Defendants have consented to personal jurisdiction and venue in the District of Columbia.  Venue, therefore, is proper under Section 12 of the Clayton Act, 15 U.S.C. § 22 and 28 U.S.C. § 1391(c).

## IV.      RELEVANT MARKETS

### A.      Relevant Product Markets

#### 1.      WVDOT Aggregate

12.      Aggregate is particulate material that primarily includes crushed stone, sand, and gravel.  It is produced at mines, quarries, and gravel pits and is used for a variety of construction projects.  Aggregate generally can be categorized based on size into fine aggregate and coarse aggregate.  Within the categories of fine and coarse aggregate, aggregate is further identified based on the size of the aggregate and the type of rock that it is.  Aggregate can also differ based on hardness, durability, and polish value, among other characteristics.

13.     The various sizes and types of aggregate are distinct and often used for different purposes.  For example, the aggregate that is used as a road base may be different than the aggregate that is mixed into asphalt concrete.

14.     Aggregate is an essential component of road construction projects, such as building or repairing roads.  Aggregate is used in road projects as a base that is laid and compacted under the asphalt concrete.  Aggregate also is an essential ingredient in asphalt concrete, which is used for paving roads and other areas.  There are no substitutes for aggregate in these types of road construction projects because no other material can be used for the same purpose.

15.     To evaluate the proposed acquisition's effects on the market for aggregate, it is appropriate to include all sizes and kinds of aggregate because, with limited exceptions, each size and type of aggregate is offered under similar competitive conditions in the relevant geographic market.  Thus, the grouping of the various sizes and types of aggregate makes evaluating competitive effects more efficient without undermining the reliability of the analysis.  One exception to this aggregation is "friction-course" aggregate, which is a specialized variety used exclusively to create the anti-skid surface layer of roads.  Pounding Mill does not have the ability to manufacture friction-coarse aggregate and the competitive conditions for that product are not similar to the remaining aggregate market.

16.     Because different types, sizes, and qualities of aggregate are needed depending on the intended use, the end-use customer establishes the exact specifications that the aggregate must meet for each application.  These specifications are designed by the project engineers to ensure the safety and longevity of road construction projects.

6

17.     WVDOT purchases significant quantities of aggregate for its road construction

projects, which include building, repairing, and maintaining roads and bridges in West Virginia.

For these projects, aggregate is needed as an input into the asphalt concrete that is used to pave

the roads.  Aggregate is also necessary for other parts of the road or bridge, such as road base.

WVDOT also purchases significant quantities of aggregate for its maintenance yards.  These

maintenance yards are used to store the aggregate purchased directly by WVDOT for use on the

projects WVDOT completes itself, instead of through a contractor, such as fixing a pothole or

repaving a small area of a road.

18.     For each road project, WVDOT provides the precise specifications for the

aggregate used for asphalt concrete and road base, among other things.  For example, particular

types of aggregate are used to strengthen the asphalt and ensure that the road remains stable.

WVDOT specifications are designed to ensure that the roads and bridges are built safely and

withstand heavy usage over time.  WVDOT tests the aggregate used in its projects to ensure that

it meets specifications.  The use of aggregate that does not meet WVDOT specifications could

compromise the safety of roads or bridges, or cause the need for repairs sooner than would

otherwise be required.  Therefore, aggregate that does not meet WVDOT specifications cannot

be used.

19.     A small but significant increase in the price of aggregate that meets WVDOT

specifications (hereinafter "WVDOT aggregate") would not cause WVDOT to substitute other

types of materials in sufficient quantities, or to utilize aggregate that does not meet its

specifications, with sufficient frequency so as to make such a price increase unprofitable.

Accordingly, WVDOT aggregate is a line of commerce and a relevant product market within the

meaning of Section 7 of the Clayton Act.

### 2.    WVDOT Asphalt Concrete

20.    Asphalt concrete is a composite material that is used to surface roads, parking lots, and airport tarmacs, among other things.  Asphalt concrete consists of aggregate combined with liquid asphalt and other materials.  After it is mixed, the asphalt concrete is laid in several layers and compacted.  Asphalt concrete has unique performance characteristics compared to other building materials, such as ready mix concrete.  For example, asphalt concrete is the desired material used to build roadways because it has optimal surface durability and friction, resulting in low tire wear, high breaking efficiency, and low roadway noise.  Other products generally cannot be used as economically to build and maintain roadways and therefore are not adequate substitutes.  Ready mix concrete in particular is significantly more expensive for paving roadways than asphalt concrete and takes significantly longer to set, delaying the use of the road.  Only in limited circumstances can ready mix concrete be used to build new roads.  In addition, ready mix concrete cannot be used for repairing asphalt-concrete roads.

21.    WVDOT purchases significant quantities of asphalt concrete for road construction and maintenance projects within the State of West Virginia.  For each road project, WVDOT provides the precise specifications for the asphalt concrete.  WVDOT specifications are designed to ensure that the roads are built safely and withstand heavy usage over time.  WVDOT tests the asphalt concrete used in its projects to ensure that it meets WVDOT specifications.  Using asphalt concrete that does not meet WVDOT specifications could compromise the safety of the road or cause the need for repairs sooner than would otherwise be required.  Therefore, asphalt concrete that does not meet WVDOT specifications cannot be used.

22.    A small but significant increase in the price of asphalt concrete that meets WVDOT specifications (hereinafter "WVDOT asphalt concrete") would not cause WVDOT to

8

substitute other materials in sufficient quantities, or to utilize asphalt concrete that does not meet its specifications, with sufficient frequency so as to make such a price increase unprofitable. Accordingly, WVDOT asphalt concrete is a line of commerce and a relevant product market within the meaning of Section 7 of the Clayton Act.

### B.    Geographic Markets

#### 1.    WVDOT Aggregate

23.    Aggregate is a relatively low-cost product that is bulky and heavy, with high transportation costs.  The geographic area an aggregate supplier can profitably serve is primarily determined by:  (1) the distance from the quarry to the job site where the aggregate is used; and (2) the relative distance between the supplier's competitor's quarry and the job site compared to its own.  Suppliers know the importance of transportation costs to a customer's selection of an aggregate supplier and also know the locations of all their competitors.  An aggregate supplier can often charge a lower/more competitive price than its competitor if its quarry is closer to the customer's location than its competitor's quarry.

24.    CRH Americas owns and operates aggregate quarries located in Beckley and Lewisburg, West Virginia.  Those quarries sell WVDOT aggregate to customers with plant locations or job sites in the following four counties in West Virginia:  Wyoming, Raleigh, Mercer, and Summers (these four counties are hereinafter referred to as "Southern West Virginia").  Customers with plant locations or job sites within Southern West Virginia may also economically procure WVDOT aggregate from Pounding Mill's quarries located in Princeton, West Virginia and Rocky Gap, Virginia, and from another smaller third-party quarry located in Lewisburg, West Virginia.  For many customer locations in Southern West Virginia, quarries

owned by CRH Americas and Pounding Mill are the two closest options and can quote different prices based on the location of a customer in relation to each supplier's quarries.

25.    Figure 1 below shows the locations of CRH Americas' and Pounding Mill's aggregate quarries in and near Southern West Virginia.

**Figure 1: Locations of Defendants' Aggregate Quarries**



26.    A small but significant post-acquisition increase in the price of WVDOT aggregate to customers with plants or job sites in Southern West Virginia would not cause those customers to substitute another product or procure aggregate from suppliers other than CRH Americas, Pounding Mill, and the third competitor in sufficient quantities so as to make such a price increase unprofitable.  Accordingly, Southern West Virginia is a relevant geographic market for WVDOT aggregate within the meaning of Section 7 of the Clayton Act.

## 2.    WVDOT Asphalt Concrete

27.    As with aggregate, the geographic area an asphalt-concrete plant can profitably serve is primarily determined by the location of its plant in relation to the job site and the relative location of competing suppliers.  Asphalt-concrete suppliers typically deliver asphalt concrete to a job site.

28.    Distance from the plant to the job site is important for two reasons—temperature and transportation costs.  First, asphalt concrete must be maintained at a certain temperature range before it is poured.  If the temperature drops below that required by the asphalt-concrete specifications, it cannot be used.  The temperature of asphalt concrete drops as it travels from the plant and drops faster in colder weather than in warmer weather.  As a result, the distance between an asphalt-concrete plant and the project site determines whether a plant can service a particular geographic area.  Second, asphalt concrete is heavy and as a result transporting it is expensive.  Therefore, the distance between the site where the asphalt concrete is poured and the asphalt-concrete plant drives the transportation costs and has a considerable impact on the area a supplier can profitably serve.

29.    A further factor that determines the area a supplier can profitably serve is the location of its plant in relation to the location of competing plants.  Suppliers know the importance of transportation costs to a customer's selection of a supplier and also generally know how far each competing supplier can deliver asphalt concrete.  An asphalt-concrete supplier often can charge a lower/more competitive price than its competitor if its plant is closer to the customer's location than its competitor's plant.

30.    CRH Americas has an advantage with respect to transportation costs because it owns several asphalt-concrete plants in Southern West Virginia.  CRH Americas owns and

11

operates three of the four asphalt-concrete plants that supply WVDOT asphalt concrete and serve customers in Southern West Virginia.  Customers with job sites in Southern West Virginia may also economically procure WVDOT asphalt concrete from CRH Americas' sole asphalt-concrete competitor, which operates one asphalt-concrete plant in Mercer County.  Pounding Mill does not own any asphalt-concrete plants, though it is currently supplying CRH Americas' competitor in the production of asphalt concrete with the aggregate it needs to compete.  Thus, the four asphalt-concrete plants that serve Southern West Virginia procure aggregate from CRH Americas and Pounding Mill.

31.     Figure 2 below shows the locations of the four asphalt-concrete plants in Southern West Virginia and the location of the aggregate quarries that supply those plants.

**Figure 2:  Asphalt-Concrete Plants and Serving Quarries**



32.     A small but significant post-acquisition increase in the price of WVDOT asphalt concrete to customers with job sites in Southern West Virginia would not cause those customers

to substitute another product or procure WVDOT asphalt concrete from suppliers other than

CRH Americas or its rival in sufficient quantities so as to make such a price increase

unprofitable.  Accordingly, Southern West Virginia constitutes a relevant geographic market for

WVDOT asphalt concrete within the meaning of Section 7 of the Clayton Act.

## V.   ANTICOMPETITIVE EFFECTS OF CRH AMERICAS' ACQUISITION OF POUNDING MILL

### A.   Anticompetitive Effects in the Market for WVDOT Aggregate

33.   If CRH Americas acquired Pounding Mill, competition would be substantially

lessened for the supply of WVDOT aggregate in Southern West Virginia.  This market is already

highly concentrated and would become significantly more concentrated as a result of CRH

Americas' acquisition of Pounding Mill's quarries.

34.   For all WVDOT aggregate supplied in Southern West Virginia, including

aggregate supplied to WVDOT through contractors for road projects and aggregate purchased

directly by WVDOT for its maintenance yards, CRH Americas and Pounding Mill's combined

market share is well over 80 percent.  Moreover, the companies' combined share is even

higher—over 90 percent—for the aggregate supplied by contractors for use in road projects.

35.   Acquisitions that reduce the number of competitors in already concentrated

markets are more likely to substantially lessen competition.  Concentration can be measured in

various ways, including by market shares and by the widely-used Herfindahl-Hirschman Index

("HHI").  Under the *Horizontal Merger Guidelines*, post-acquisition HHIs above 2,500 and

changes in HHI above 200 trigger a presumption that a proposed acquisition is likely to enhance

market power and substantially lessen competition in a defined market.

36.     Premerger, the HHI for aggregate supplied for WVDOT road projects is approximately 4,350.  The post-acquisition HHI is approximately 8,500, with an increase of over 4,000.  For WVDOT aggregate purchased by WVDOT for its maintenance yards, the premerger HHI is approximately 3,800.  Post-acquisition, the HHI is approximately 6,700, with an increase of nearly 3,000.  Given the extraordinarily high pre- and post-acquisition concentration levels in the relevant markets described above, CRH Americas' proposed acquisition of Pounding Mill presumptively violates Section 7 of the Clayton Act.

37.     CRH Americas and Pounding Mill compete vigorously in the market for WVDOT aggregate in Southern West Virginia.  For many customers and job sites in that area, they are the first- and second-best sources of supply for aggregate in terms of price, quality, and reliability of delivery.

38.     Only one other company, located in Lewisberg, West Virginia, is able to supply WVDOT aggregate in Southern West Virginia in any meaningful quantity.  But while this competitor supplies WVDOT aggregate to maintenance yards, it has not bid on many road projects, leaving only CRH Americas and Pounding Mill to compete for many of those large projects.

39.     While a few other small suppliers provide limited quantities of WVDOT aggregate for maintenance yards in Southern West Virginia, they are unable to provide the large quantity of aggregate needed on road projects and do not supply the types or quality of aggregate needed for the asphalt concrete and road base.  For example, the quarries located to the south and west of Pounding Mill's quarries are too far from Southern West Virginia to effectively compete in the relevant market and, as a result, have a small share in that market and almost no influence on price.

14

40.     The proposed acquisition would substantially increase the likelihood that CRH Americas would unilaterally increase the price of WVDOT aggregate to customers in Southern West Virginia.  Without the constraint of competition between CRH Americas and Pounding Mill, the combined firm would have a greater ability to exercise market power by raising prices to customers for whom CRH Americas and Pounding Mill were the two best sources of WVDOT aggregate.

41.     Therefore, the proposed acquisition would substantially lessen competition in the market for WVDOT aggregate in Southern West Virginia.  This is likely to lead to higher prices for the ultimate consumers of such aggregate, in violation of Section 7 of the Clayton Act.

**B.      Anticompetitive Effects in the Market for WVDOT Asphalt Concrete**

42.     CRH Americas' acquisition of Pounding Mill would substantially lessen competition in the market for WVDOT asphalt concrete in Southern West Virginia.  CRH Americas has historically dominated this market.  Pounding Mill does not compete directly with CRH Americas in the asphalt-concrete market, but it is a supplier of aggregate to CRH Americas' only competitor.  That competitor, a recent entrant, has begun making inroads in the WVDOT asphalt-concrete market, and eroding CRH Americas' dominant position.  By building its asphalt-concrete plant close to Pounding Mill's quarry in Mercer County, this entrant attempted to ensure that it would have a reliable, nearby source of aggregate, which allowed it to charge competitive prices.  Pounding Mill is uniquely positioned to provide asphalt-concrete producers such as this entrant with competitively-priced aggregate, because it is not itself

vertically integrated, and so has no incentive to raise the costs or otherwise disadvantage other asphalt-concrete producers.

43.     If the proposed acquisition were consummated, this entrant could no longer be assured an economical source of WVDOT aggregate.  Post-merger, CRH Americas would have the ability and incentive to use its ownership of Pounding Mill's quarries to disadvantage its rival by either withholding WVDOT aggregate or supplying it at less favorable terms than Pounding Mill currently provides.

44.     Any post-merger conduct by CRH Americas that cuts off the supply of WVDOT aggregate or raises the cost of that input, would weaken its asphalt-concrete rival's ability to compete on price.  If CRH Americas' rival cannot win WVDOT contracts, it may find it impossible to stay in business, thereby ensuring CRH Americas' control over the entire market for WVDOT asphalt concrete in Southern West Virginia.

45.     Post-acquisition, CRH Americas would have the incentive and ability to raise the price or sacrifice sales of WVDOT aggregate in order to maintain its dominance in the asphalt-concrete market.  Such a strategy would be attractive in part because the sale of asphalt concrete is significantly more profitable than the sale of aggregate.  Therefore, if CRH Americas were able to gain additional asphalt-concrete sales by raising the price of aggregate to its rival, foreclosing supply, or delaying deliveries, the additional asphalt-concrete sales would be considerably more profitable to CRH Americas than any lost aggregate sales.

46.     By raising the costs of its sole competitor in the provision of WVDOT asphalt concrete, CRH Americas likely would gain the ability to unilaterally raise the price of WVDOT asphalt concrete in Southern West Virginia.

16

47.     Therefore, the acquisition of Pounding Mill's quarries would give CRH Americas the incentive and ability to either eliminate or raise the costs of its sole asphalt-concrete competitor.  As a result, the acquisition would substantially lessen competition in the market for WVDOT asphalt concrete in Southern West Virginia in violation of Section 7 of the Clayton Act.

## VI.    ENTRY WILL NOT CONSTRAIN CRH AMERICAS' MARKET POWER IN THE RELEVANT MARKETS

48.     Entry into the market for WVDOT aggregate in Southern West Virginia is unlikely to be timely, likely, and sufficient to constrain CRH Americas' market power post-merger given the substantial time and cost required to open a quarry.  Entry is likely to take two years or more.  First, securing the proper site for a quarry is difficult and time-consuming.  There are few sites on which to locate coarse aggregate operations in or near Southern West Virginia. Finding land with the correct rock composition requires extensive investigation and testing of candidate sites, as well as the negotiation of necessary land transfers, leases, and/or easements. Further, the location of a quarry close to likely job sites is extremely important due to the high cost of transporting aggregate.  Once a location is chosen, obtaining the necessary permits is difficult and time-consuming.  Attempts to open a new quarry often face fierce public opposition, which can prevent a quarry from opening or make opening it much more time-consuming and costly.  Finally, even after a site is acquired and permitted, the owner must spend significant time and resources to prepare the land and purchase and install the necessary equipment.

49.     Moreover, once a quarry is operating, a supplier must demonstrate that its aggregate meets WVDOT specifications.  WVDOT qualification requires testing.  Until the

aggregate can meet these specifications, it cannot be used to supply WVDOT road construction projects.

50.     Entry into the market for WVDOT asphalt concrete in Southern West Virginia also is unlikely to be timely, likely, and sufficient to constrain CRH Americas' post-merger market power.  Potential entrants in WVDOT asphalt concrete must have access to WVDOT aggregate.  Only CRH Americas and one other competitor would be available to supply WVDOT aggregate in Southern West Virginia and, for many locations in Southern West Virginia, the remaining competitor would not be an economical alternative.

51.     Post-acquisition, CRH Americas would have the incentive and opportunity to foreclose its competitors' access to WVDOT aggregate or disadvantage its rivals by either withholding WVDOT aggregate or supplying it on less favorable terms.  Lack of access to a reliable, independent supply of aggregate would deter or prevent timely or sufficient entry into the asphalt-concrete market in Southern West Virginia.

52.     In addition, an entrant into the asphalt-concrete market would have to purchase appropriate land close to an aggregate quarry, build a plant, procure the necessary land-use and environmental permits, and obtain WVDOT approval of each asphalt-concrete mix made, among other things.  These actions involve significant costs and often lengthy time periods.

## VII.    THE ACQUISITION VIOLATES SECTION 7 OF THE CLAYTON ACT

53.     If allowed to proceed, CRH Americas' proposed acquisition of Pounding Mill is likely to substantially lessen competition in the markets for WVDOT aggregate in Southern West Virginia and WVDOT asphalt concrete in Southern West Virginia in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

54.     Unless enjoined, the proposed acquisition likely would have the following anticompetitive effects, among others:

(a)     actual and potential competition between CRH Americas and Pounding Mill in the market for WVDOT aggregate in Southern West Virginia would be eliminated;

(b)     the sole remaining competitor for WVDOT asphalt concrete would lose its aggregate supplier or be forced to pay significantly higher prices for aggregate, substantially reducing price competition in the market for WVDOT asphalt concrete;

(c)     prices for WVDOT aggregate in Southern West Virginia likely would increase and customer service likely would decrease; and

(d)     prices for WVDOT asphalt concrete in Southern West Virginia likely would increase and customer service likely would decrease.

## VIII.   REQUESTED RELIEF

55.     The United States requests that this Court:

(a)     adjudge and decree that CRH Americas' acquisition of Pounding Mill's assets would be unlawful and violate Section 7 of the Clayton Act, 15 U.S.C. § 18;

(b)     preliminarily and permanently enjoin and restrain defendants and all persons acting on their behalf from consummating the proposed acquisition of Pounding Mill or its assets by CRH Americas, or from entering into or carrying out any other contract, agreement, plan, or understanding, the effect of which would be to combine CRH Americas with Pounding Mill;

(c)     award the United States its costs for this action; and

(d)     award the United States such other and further relief as the Court deems just and proper.

Dated:  June 22, 2018

Respectfully submitted,

FOR PLAINTIFF UNITED STATES OF AMERICA:

_____
Makan Delrahim (D.C. Bar #457795)
Assistant Attorney General for Antitrust

_____
Andrew C. Finch (D.C. Bar #494992)
Principal Deputy Assistant Attorney General

_____
Bernard A. Nigro, Jr. (D.C. Bar #412357)
Deputy Assistant Attorney General

_____
Patricia A. Brink
Director of Civil Enforcement

_____
Maribeth Petrizzi (D.C. Bar #435204)
Chief, Defense, Industrials, and Aerospace
Section

_____
Stephanie A. Fleming
Assistant Chief, Defense, Industrials, and
Aerospace Section

_____
Christine A. Hill (D.C. Bar #461048)
Daniel Monahan
Angela Ting
Attorneys
United States Department of Justice
Antitrust Division
Defense, Industrials, and Aerospace Section
450 Fifth Street, N.W., Suite 8700
Washington, D.C.  20530
(202) 305-2738
christine.hill@usdoj.gov